Yes indeed, Your Honor, and good morning. May it please the Court, Charles Cooper for the Plaintiff Appellant. I want to say at the outset that I'm acutely aware of the headwind that I sail into as I attempt to persuade you that all three of the circuits that have rejected the same arguments that I'm here to advance to you got it wrong, and the lone dissenting judge, Judge Brown, in the D.C. Circuit got it right. But I'm bound to say that the interpretation of HERA that my friends representing the government have successfully persuaded three circuits is wrong. And I'm frank also to say not only is it wrong, it's not tenable. Let me begin with the word may. That's the fulcrum. The word may in 4617b2d, the provision outlining the essential powers, the mission of a conservator. Because that provision uses the word may and not shall, the government says that it is entirely discretionary. It imposes no obligation on the conservator, FHFA as conservator, to, in the words, to take action intended, and these are words from the subsection itself, to put the regulated entity in a sound and solvent condition and to carry on the business of the regulated entity and to preserve and conserve its assets. The conservator may take actions intended to do that or it may not, according to the government. Indeed, under their reading, which they say there's no such thing as a bad motive, motives are irrelevant, reasons make no difference, purpose is irrelevant, they can take that action or not for any purpose at all, not just the purposes defining the conservator's mission in B2D. Counsel, what do we do with the fact that, and I understand your argument that may can't impose a duty, if contextually it could look like a shall, but the problem I have with your argument is the statute uses the word shall 142 times, and here we have the word may, and so doesn't the use of the word shall elsewhere undermine your argument? Your Honor, I do not believe it does, and let me tell you why. Let's look at where the word is may. Let's look at that. The statute uses that in every pertinent provision granting power to a conservator. Let's look at B2B. Let's look at B2B. The FHA as conservator may, quote, take over the assets and operate the regulated entity, and it may conduct all debts and perform all functions of the regulated entity, but according to the government's discretionary interpretation of may, the conservator doesn't even have to do these absolutely essential powers. These are essential things, and yet the government doesn't have to take over the assets. It doesn't have to perform these functions. It doesn't even have to collect the debts of the regulated entity, and the government again says their motivations, they can't have a bad motive. Their motivations are irrelevant. Not once in any of these cases, and I believe I'm familiar with them all, has the government offered a single act that if it took, it would be ultraviolet. It would, as we say in our APA case, classic standard APA case, it would exceed their statutory authority. The result of this interpretation... Sure they concede some crimes or something, wouldn't they? Like the crime fraud exception to attorney client. Wouldn't they concede some crime and fraud or something like that? Well, Your Honor... We can ask them. We can ask them. Go ahead. We have never heard them say that an act that they took as conservator would be ultraviolet and would give a court the authority under F, the judicial immunity provision, to restrain that act in a standard classic APA case like the one I have brought to you. But the result, Judge Strauss, of their interpretation, looking at the word may, is that it's a mere suggestion, and that's implausible on its face. When you look at the other places where it uses may, it becomes untenable, I would suggest to you. But it really boils down to that they have essentially argued that it is not possible for them to act ultraviores, which in the face of their concession that if they could act ultraviores, it would allow judges to concede. It means that basically the range of possible actions for a litigant to bring to a court is a null set. So if they would concede that there is something outside of the power, something ultraviores, then what does that do to your position on the word may? Well, they've not done that before. They've not done that before. What if we concluded that that were the case? How does that affect your argument as to the use of the word may in this particular provision? Well, they say may is permissive, discretionary, non-binding, a suggestion. In B2D, what would their argument be that the word may in these other places is somehow not just a suggestion but is a you may do this and you may not do something else, which is our submission. It's that this isn't a suggestion. The actions that it authorizes, B2D, have to be directed towards these defining purposes, which this court in Cederman said are the defining mission, the defining purposes of conservators as long as there has been regulation of financial institutions by the federal government. Their argument renders the judicial review provision completely superfluous. It's a null set again. There's nothing I could bring you challenging their acts as a conservator under their interpretation and under the interpretation that has been accepted by the D.C. Circuit and two others. If you read their opinions, this is what they're saying. Counsel, part of your theory is that, and I think this was the theory of Judge Brown in the D.C. Circuit case, is that the common law definition and the duties inherent in a conservator are incorporated in this statute. But one of the questions I have is this statute, as you note, is extremely broad. I mean, that's really the thrust of your argument, overly broad. And so one of the unique aspects of this statute is it allows the agency to act in its own interests or in the interests of Fannie or Freddie. And I'm wondering whether that undermines your common law argument, because I don't know of any conservator relationship where the conservator can act in the conservator's best interest when that doesn't align with the ward's best interest. Your Honor, we have maintained, as this Court said in Cederman, that a conservator in the federal statutes always, its defining mission is to operate the business, carry it on, conserve and preserve the assets, try to rehabilitate it, as A. 2 says in this statute. All, if I rea, also said that the conservator or receiver could act in the interests of the institution, or there it said depositors, because it was dealing with depository institutions and they have completely different interests to the stockholders, or the conservator itself, the agency as conservatory. This is not new in federal regulation. The question becomes, and again, every time they've quoted this provision, B. 2J, they have omitted, as did the D.C. Circuit, I have to say, they've omitted very key, inconvenient language from that provision. What it says is the conservator, quote, may take any action authorized by this section which the agency determines is in the best interest of the regulated entity or the agency. So yes, they can take actions which they believe to be in their best interest, but only the actions authorized in this section. Well, let's go back to see what is authorized in this section. What is authorized, the specific B. 2D authority, defining their mission, Your Honor, is they have to put it in a safe and sound, solvent, sound condition. Now, that's the powers conservator. Yes. The section also is entitled conservator or receiver. The section is very broad, so it's in any action authorized by the section includes receiver powers, right? That's the title of the section, A in several. It says conservator or receiver. B says powers of as conservator or receiver. So help me. And in fact, the words you read say may as conservator or receiver. Go ahead. Well, Your Honor, yes, it may take actions. If you're referring to B. 2J, then yes, it may take actions as conservator or receiver. Or receiver. But when it is taking actions as a conservator, it is B. 2D that defines what those actions must be directed toward. Even though B enacted by Congress, subsection B is entitled powers and duties as conservator or receiver. No, Your Honor. That is a subsection. I'm looking at the law. I understand what you're saying about D. D says powers as conservator. Are you following? Oh, yes, yes. Powers and duties. But look at what B says. B says powers and duties of the agency as conservator or receiver. B. 2B, you're saying? No, just the plain B. Just when you look at B before you go into any subsection. Oh, yes, Your Honor. And then it... And then 2 has general powers. Yes. So now when it says back here, any action authorized by the section, I think it means the whole section, not just part of the section. Well, that's fair enough, Your Honor. The whole section. But what is it that this section tells us specifically about a conservator? What powers, what actions that it may take? It may take such actions, quote, as may be necessary to put it in sound in solving a problem condition. In other words, its actions are defined by a purpose, a reason. It can't take an action that is... We would submit to you that is motivated by a desire to do something else, especially to do something inimical to those purposes, which we submit to you that well-pled allegations of our complaint make out. And they do mixed conservator and realtor stuff? Your Honor, there are... Receiver. I said the wrong word, but... Well, I think I understand you, Judge Benton. Yeah, I'm sorry. And there are powers, there are actions that both a conservator and a receiver can take. I think the B to B powers, those actions, are actions that generally either one can take, but when you come specifically to the succeeding subsections, unless they are really to have no independent meaning, and the FHA can do whatever it wishes either and put on a conservator or receivership hat at its whim without actually declaring a receivership and doing what B to E requires of it, which is to immediately place in liquidation and begin winding it up, then the statute really becomes incoherent. Frankly, it's incoherent. Counsel, I agree with you on the point that the agency is going to be limited by the powers granted by Congress and the statute, but I get back to the common law duties. I can't figure out where those come in, and I understand that the D.C. Circuit dissent found that differently, but with this being not a typical conservator-ward relationship, I'm trying to figure out what the bounds of our review is. Are we reviewing to see whether or not the statute was followed, or are we—so you're not making the common law argument, then? No, I'm not calling it the common law. I'm sorry I didn't follow the thrust of your question, Judge Strauss. I'm not here arguing that the common law somehow, I don't know, trumps the saying, that as you look at it, you should keep in mind that this wasn't just—they didn't just invent this in 2008. This builds upon Faria. Go look at your decision in Cedermont, Your Honor. Before I dig too deeper into my rebuttal time, I'm bound to say, so that my friends will have a chance to answer, a point about the succession clause. That's the alternative argument. The succession clause, B2A, which says that the conservator or receiver immediately succeeds to all rights of any stockholder with respect to the companies or their assets. The district court relied as an alternative ground, and they've advanced, that we lack prudential standing because our cause of action has essentially gone, as stockholders, has gone. This is wrong, both as a matter of federal and state law. I don't have time to trudge through the Thule factors and all the state law stuff here, but I do want to leave you with this key point. We have brought a classic, standard APA case. We've simply said that you must set aside the acts that they've undertaken that are in excess of statutory authority. The APA confers standing on any person aggrieved, and it does away with prudential standing. The loss of our entire investment clearly places us within the zone of interest that HERA was designed to protect. Here's my key point. The judicial review provision itself, subsection F, confirms this. It confirms our view that Congress itself understood that stockholders would have a direct cause of action under the APA because they authorized you to hear my plea if it is that they exceed their authorities. That's the only claim that you're authorized under F to hear. That they exceeded their authorities, APA standard classic claim, just like the one I'm here to provide to you. So Congress surely understood this, that such claims must be direct because it obviously didn't intend, it couldn't have intended that a claim to restrain the conservator's acts as ultraviaries could only be brought by the conservator itself suing itself. That kind of intent can't be attributed to Congress because it's preposterous. If I may. Thank you. Mr. Cain. May it please the Court, Howard for a very long time. I heard many of the same points, well stated as they were, before Judge Pratt in Iowa in December 2014. And I mention that only because in addition to the three courts of appeals that have agreed with our position, we also have Judge Pratt's court in Iowa. We have the court in Collins in Texas, and we have the Judge Pratt's court in Delaware. Counsel, but now you've got to confront Cederment. What do you do with page 1454 of the Cederment opinion where we go to great lengths to distinguish a conservator's job from a receiver's job? And it's under the predecessor statute that Congress copied. First Your Honor, perhaps you're indicating this, the Cederment case involved a conservatorship and receivership both which commenced before the enactment of FIREA. The statute that plaintiffs keep pointing to, and often correctly, that HERA was structured on, based on, was not yet in effect. That conservatorship was under whatever existed before FIREA. Well that's a nice distinction, but that's not what this Court says. This Court says this distinction was specifically recognized in FIREA, quote legislative history, but still you get my point. They were talking about FIREA and Congress says in this law they copied FIREA. Yes Your Honor, and even if the Court were to, even if I would say this conservatorship and receivership were post-FIREA, that case did not involve any of the issues we have in this case. The analog to 4617F for example. It simply was looking at, it was dealing, as I recall Your Honor, with repudiation and how quickly does repudiation have to happen. And at bottom I thought that case helped us because it treated the conservator and the receiver for most purposes as having the same authorities. And that is the fact, except for the power of Congress, that uses, the statute uses the word shall. It says if a receiver is appointed, the receiver shall liquidate. No choice. But in many other contexts, such as the context we believe dispositive here, the word may is used. But Judge Bink. Counselor, I want to step back for a second and ask you a question. I just want to understand exactly what that third amendment did. When you look at that third amendment, one of the conclusions I have is that it effectively nationalized Freddie and Fannie. Because there's no room for private investors. All the excess net worth goes to the treasury. And I'm wondering, am I right about that? And if I'm wrong, tell me why I'm wrong. Your Honor, the third amendment needs to be viewed in the context of the overall agreement, which is not challenged, which was executed between treasury and the FHFA as conservator in 2008. And what the third amendment was, it was a rejiggering, a restatement, an adjustment of the compensation flows to the treasury department. What happened at the initial agreement, and you won't even see a reference to this in the accounts of the complaint, is that it said treasury, if a draw is made, will get 10% dividend, and it will get certain other forms of compensation, including what was called a periodic commitment fee, which was never paid, because it had been waived, but it could have been potentially massive. When you had the agreement, the third amendment in 2012, the only thing that changed from the original agreement in 2008 was that the compensation flows changed. The 10% dividend was eliminated, and the periodic commitment fee was eliminated. Well, what's left for private investors, though? I mean, if the excess net worth of both companies are paid out in quarterly dividends to treasury, what value is left for investors, private investors? I'm not going to respond to that with a question, Your Honor, but the question perhaps assumes that there was value there on the date of the third amendment, but I would remind the court that the draws, and there were many draws, would occur only when the institutions were insolvent. So by 2012, the Treasury Department had put in, if I remember the numbers correctly, $187 billion, and that was taxpayer money, and on top of the $187 billion, the Treasury committed to infuse approximately just north of another $250 billion. That $250 billion that Treasury remains liable to infuse in times of insolvency today is the reason these institutions are operating. The markets view that commitment as capital, because the institutions generally have close to zero capital based on the structure on which they're running, and I would also urge the court to consider private investors did have a chance to make infusions. Fannie and Freddie sought private investment in early to mid to continuing through 2008, and all of those efforts failed. Well, Counsel, is that a long-winded way of saying it was worth nothing then, it's worth nothing now to investors? Is that what you're saying? Zero, zero, didn't change. Present value zero in the future, present value zero then, no big deal. Yes, Your Honor. I wanted to stay on the legal issues, but if the court were to look at that, again, you had $187 billion of Treasury infusions. Every dollar of that, before any dollar of that could be infused, there would have to be a determination made that at the time of the infusion, the institution was insolvent, and that's why the $187 billion was infused. Plaintiffs say, well, eventually dividends were achieved, and those dividends should have been used to pay down the $187 billion, and we would dispute that because there was an agreement, and Treasury would get compensated for the $187 billion it invested, and it would be compensated pursuant to the periodic commitment fee for the $250 billion plus that it's continuing to be obligated. And I apologize for taking up your time, but when those quarterly dividends could be paid, Treasury got everything, right? The private investors didn't get the quarterly dividends after the Third Amendment, did they? That's correct, Your Honor. That was pursuant to the terms of the amendment, that the terms of the agreement, the terms of the amendment is Treasury, from day one through the Third Amendment, $187 billion. And under the statute that authorized Treasury to make those investments, Treasury had to do certain things, and Congress emphasized in the—and I should also state that Treasury's authority is actually stated in the charters of Freddie and Fannie. That's where Congress includes the authority for Treasury to make these investments. And when Treasury made these investments, Congress directed, you have to do certain things. One of those was to protect the taxpayers. And Treasury and the FHFA, they negotiated, they came out with an agreement, and all these provisions, and I would say specifically the provisions for compensation, are intended to protect the taxpayers, because in addition to the taxpayer funds that have been infused, the fact that the taxpayers are potentially exposed to another $250 billion if tomorrow the institutions go insolvent deeply— I was going to ask you, I want to get to the legal questions. One of the—probably their strongest claim is the claim that the agency can't be subject to the direction or supervision of Treasury, and they make the allegation in the complaint—we're dealing with a motion to dismiss on the complaint—that this was violated. What's your best argument against their best argument? I'm going to try to talk quickly, because I'm about to run over my co-counselor. Well, and that's her role, too, so you can see how slick you can pass the ball to her. Go ahead. Real quickly is, all the statute says is Treasury can give money, and it gives the FHFA the authority to agree to take infusions if they negotiate the terms. The statute says it doesn't require FHFA to agree, and there's just no basis for these statements that somehow Treasury was over—somehow misused its power and treated the FHFA as some type of lacking. They had a negotiation. Every negotiation has terms. There's a back-and-forth. You may take different positions. But with all respect, Your Honor, I've never actually viewed that as a strong argument, because it is so clear there was a two-party negotiation. The FHFA got what it wanted. Treasury got what it wanted. And it was all as Congress envisioned when they passed the statute. I went over my time, Your Honor. Sorry. Did you get an answer? I'm good. Okay, good. Go ahead. Proceed. Ms. Wright. Abby Wright, on behalf of Treasury. I can start with the A7 point. The Roberts Court in the Seventh Circuit just two weeks ago explained that because HERA contemplates—expressly contemplates—a transaction between FHFA and Treasury on terms that the parties agreed to, it would be very strange to think that A7 would somehow prohibit Treasury and FHFA from reaching that kind of agreement. So I think that Roberts Court held on that ground. The Robinson Court in the Sixth Circuit held, as the District Court did here, that they were not—plaintiffs here are not within the zone of interest. There is statutory support for that. But suppose that the allegations and the complaint—I'd have to go back and look to see if they actually allege this—that the Treasury hijacked it. The Treasury essentially twisted arms. Maybe there's some sort of quid pro quo, something going on that was a little illegitimate, and that the agency felt bound and compelled to do it. Would that provision be violated then? Well, they don't make those allegations in the complaint. I think you could tell that from the reply brief. The reply brief, I think, sort of embraces the idea that Treasury must have had control because otherwise how do we end up where we are, rather than any kind of specific allegations about anything concrete in terms of what Treasury or FHFA did or their agreement. So I would say I don't think we have that case here. I'm happy to begin anywhere else if you have questions. I can start with the shareholder succession bar, which the Roberts Court and the Perry Capital Court also held barred this suit. These suits are quintessentially derivative suits. As the Roberts Court said, they allege mismanagement of corporate assets. They allege conflicts of interest and other quintessentially derivative claims that are advanced on behalf of the enterprises. So they would be barred under B-2A. Counsel, there are investors who invest in something that's not worth anything. You know, it has really zero value and zero future and zero everything. And they say they were investors and they're crazy enough to keep doing that. Well, a couple of responses. I mean, the first, I think, and thank you, Your Honor, for reminding me. There are taking suits proceedings in the Court of Federal Claims. So a lot of their arguments, I think, really sound in the Fifth Amendment takings claim. We are, of course, defending those suits as well. There's already a case that says they can't be brought under APA. Well, if they were... APA's case can't be brought under APA. If they were trying to bring a taking suit, that would need to be brought in the Court of Federal Claims. Doesn't the APA say any action in violation of the Constitution or statutes? It does. And it does. They're seeking damages, though, so they would need to proceed under the Tucker Act. Here they are bringing APA claims. I just think some of their more inflammatory rhetoric is really about expropriation and claims that go to the takings that they have brought in the Court of Federal Claims. In addition, the conservatorship is indefinite in term. It's been going on for quite some time now. We acknowledge that. But there may be value at the end of the day for these investors. They hold stock. The stocks are trading. How would that occur if all the excess value goes to the Treasury? I mean, would the Third Amendment have to be modified for there to be any value? Or could you actually... Could you give me a scenario where there could be value under the Third Amendment? I think there would need to be a modification of the Third Amendment or into receivership or some other Congress could propose some other path forward. I think you're right on the facts of what the Third Amendment does. To be clear, the Third Amendment shifted the risk. It's true that Treasury, in some quarters, has gained more. In some quarters, it has paid no dividend. For example, in the last quarter of 2017, because of the Tax Act, Fannie and Freddie suffered significant losses. Indeed, Fannie drew on the commitment to over $3 billion. Freddie also drew. That commitment, as my colleague noted, is still out there, $254 billion. It's critical to the enterprise's functioning. Indeed, they have drawn on that recently. The Third Amendment shifted the risk onto Treasury in bad quarters, and Treasury got a bigger benefit in successful quarters as well. Sorry, Your Honor. In addition, I want to go back to the 4617F point. It's true that this Court's role is limited to looking for whether there was an ultraviarious action. All three circuit courts that have decided this case have decided that FHFA was acting within its conservator. Okay, what could be ultraviaries? They say the way you do it, it's not possible. That's not true. Give us an example. Sure. The enterprises have a charter. That charter does not permit them to originate loans, for example. If FHFA were to attempt to operate them in a way contrary to their charter, there might be an ultraviarious action. There are also, I think, sort of fanciful ones. Judge Wall, in her concurrence in National Historic Preservation Trust, said if FHFA were selling crack cocaine to raise money, there might be ultraviaries. That's crime, right? Do you believe a crime-fraud possibility? I don't want to speak too broadly to that, Your Honor. There might be violations of law that would still courts. For example, Ward v. RTC in the Fifth Circuit said, even where the conservator may have allegedly violated some other law, like ERISA or National Historic Preservation Trust, that was National Historic Preservation Act, 4617F would still apply. So I wouldn't want to speak too broadly. It's got to be a big old crime, right? I think we've never taken the position, FHFA hasn't taken the position, that there is nothing that could be ultraviarious. It's just here we know these are not ultraviarious actions. Do you have other examples for us of what would be? I think if I keep talking, I might get myself into trouble, Your Honor. You might also clarify it for us. Go ahead. I think if we look to what the plaintiffs are saying here, they don't like the terms of the Third Amendment. They think it was a bad business deal. Every court to consider it in this context and in the FIREA context has made very clear that your disagreement, your second guessing of a business judgment, simply is not an ultraviarious action and does not give you a means to circumvent 4617F. Is there ever a situation where the business judgment is so off base that it becomes essentially the equivalent of ultraviarious? In other words, that you're saying that you're trying to preserve and conserve, but there's really just absolutely no way that what you are doing meets that goals and therefore is outside the scope of what their authority is? Our position is no. As long as there is a business judgment being made and exercising one of the conservators' powers in HERA that you wouldn't get ultraviarious action just because you thought the deal was so bad, it would really have to be an action that is outside their powers. The Seventh Circuit said fundamentally inconsistent, incompatible with the powers of a conservator. So you never look at the end result of what the judgment... Because it does seem if you really push it, you could just have terrible management and decision-making process that really was just a bulldozer through the goals, and yet that would still be within the scope of May. So courts have described it as a sweeping ouster of equitable remedies in both the FIREA context and HERA context. Congress clearly wanted to prohibit a broad swath of equitable remedies from a court. For example, in the Ward case, to go back to that FIREA case, the plaintiff there said, I am offering them more money. They will get more money from this deal if they would take my deal, let me purchase this building and not sell it to someone else. And the Fifth Circuit said, no, even that kind of allegation, which was that concrete, here we don't have anything that concrete, but it doesn't get you around 4617F. So Congress really wanted to give a lot of power to the conservators because they needed to act quickly and they needed to act without fear of injunctive relief from courts. I think it's Judge Kelly's question, what about buying worthless assets? What if they bought worthless paper? Everybody knew it was worthless, and under the management of the agency, they bought things that were absolutely worthless. Still, we can't look at that business judgment. As long as they're exercising one of their powers, that is our position. Now, this Court doesn't need to go that far, of course, if you have qualms with saying something that broad. What we're dealing with here is the renegotiation of dividend payments, managing heavy debt, as the Perry Capital Court said also. Hard to come by capital. At the time, in 2008, of course, there was no one willing to provide the kind of capital that was necessary at that time, and Treasury stepped in and bought the preferred stock and still has that $254 billion commitment out there to keep the enterprises as ongoing concerns. If there are no further questions... Well, you want to comment on Cederman? Oh, sure. I have it right in front of me. That's one of their best arguments, of course. I think there's nothing incompatible with what's happening here with what the conservator in Cederman was described as doing. So it says, the conservator's mission is to conduct an institution as an ongoing business. These have been conducted as ongoing businesses. There has been no liquidation. There, Cederman was, as my colleague explained, was grappling with the question of, did you get to sort of repudiate contracts again when you became receiver? And so this court wanted to make a distinction to sort of show that, yes, you could make that decision. The decision might be different if you're conservator or receiver. So that's the context in which this court was distinguishing those two roles. Thank you. We would ask the district court to be affirmed. Thank you. Thank you, Ms. Wright. Mr. Cooper. A few very quick points. First of all, Judge Strauss, we don't mean to suggest that may does mean shall. What we do mean to suggest that may means you can only do that which you have been authorized to do. You can do ABC, but you can't do XYZ, and you certainly can't do the opposite of ABC. Judge Kelly, as your question, I think, went to. Judge Strauss, the Third Amendment did nationalize Freddie and Fannie. There's no other way to understand it, as you have suggested. Let's remember what the Treasury's own press release said when they announced the Third Amendment. They said, We are taking these actions to ensure that every dollar of earnings would be used for the benefit of taxpayers. That's a quote. Further, they said, To ensure that Fannie and Freddie will not be allowed to retain earnings, rebuild capital, or return to the market. Their purpose, which cannot possibly be reconciled with B2D, it's so off base, Judge Kelly. Their purpose was to hold these entities in permanent conservatorship captivity in order to harvest their profits purely for the government itself. It was a classic nationalization. It's never been done in this country before. If this doesn't go beyond their powers as a conservator, then it is certainly true nothing would possibly, it beggars the imagination to think of what might. How do we know? So if we talk about, you're saying they may do these things so long, certain actions, so long as they're within the authority. What's the deciding point? Is that when it's a complete disaster, when they're buying completely worthless securities, when does it become, how can you describe for me in sort of, whoops, a couple of sentences, when it becomes outside the authority? I would say, Your Honor, if the conservator takes actions that are not directed towards putting them in a sound and. What if they take actions that they say, well, we're trying, but they're just really bad decisions and it's a disaster. Well, Your Honor, we're not here bringing you a close case. Yes, within, they do have discretion within these broad terms. We don't deny that, but they can't do something that's antithetical to the, to the defining purpose of a, of a conservator. And, and with respect, Judge Strauss, no value says my friend for the, for the government in these chairs, if there had been no third amendment, there'd be a hundred over $120 billion worth of tangible capital in these entities. The private shareholders would have gotten the benefit of that and they would have been on their way to being returned to normal business operations. Coercion. You look in our complaint, Your Honor. And by the way, you have to accept our allegations as fact. I surely I get to go try these matters. Counsel your time is expired. It is. Thank you. Thank you for the argument. Case number 17 dash 1727 is submitted for decision.